**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DAVID A. TAYLOR (Cal. Bar No. 247433)
(dtaylor@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for the Debtors and
Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>LEFEVER MATTSON, a California corporation, *et al.*,[1]<br><br>              Debtors. | Lead Case No. \_\_-\_\_\_\_\_ (CN)<br><br>(Joint Administration Requested)<br><br>Chapter 11<br><br>**DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**<br><br>**Date:** TBD<br>**Time:** TBD<br>**Place:** United States Bankruptcy Court<br>       1300 Clay Street, Courtroom 215<br>       Oakland, CA 94612 |

---

[1]     The last four digits of LeFever Mattson's tax identification number are 7537. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://veritaglobal.net/LM. The address for service on the Debtors is 6359 Auburn Blvd., Suite B, Citrus Heights, CA 95621.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

I, Bradley D. Sharp, do hereby declare as follows:

1.      I am the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a leading provider of management consulting and financial advisory services, including turnaround consulting, fiduciary roles, and financial restructuring services, with numerous offices throughout the country.

2.      I have more than 30 years of experience providing crisis management, financial advisory, and third-party fiduciary services.  I have operated and sold publicly and privately-held troubled companies in and out of bankruptcy.  I have also served as an expert witness with respect to banking, finance, and securitizations.  Some of my relevant experience includes the following matters:

   a.      Chief Restructuring Officer of Woodbridge Group of Companies, LLC, a real estate development company, through its 305 related debtors with more than 8,000 investors and claims of $1 billion.

   b.      Chapter 11 Trustee for Namco Capital Group, Inc., a West Los Angeles-based real estate investment company through which $3 billion flowed between 2003 and 2008 with investments in over 100 real estate projects.

   c.      Chief Restructuring Officer of Variant Holding Company, LLC, a parent company controlling 26 different multi-family properties with more than 8,000 units in five states.

Each of the above engagements included allegations of fraud and required a significant forensic accounting analysis performed under my supervision.

3.      Prior to joining DSI, I was a vice president and senior commercial loan collection officer with Bank of America, NT&SA.  I had been with the bank, through its acquisition of Security Pacific National Bank, since 1985.  I have a Bachelor's of Science in accounting, with an emphasis in business computer information systems, from Colorado Mesa University in Grand Junction, Colorado.

/ / /

/ / /

4.     I am a director and member of the Executive Committee for the American Bankruptcy Institute.  I am also a fellow of the American College of Bankruptcy as well as the Assistant Treasurer of the International Insolvency Institute.

***

5.     LeFever Mattson, a California corporation ("LeFever Mattson"), manages a large real estate portfolio.  Timothy LeFever and Kenneth W. Mattson each own 50% of the equity in LeFever Mattson.

6.     LeFever Mattson directly or indirectly controls or has ownership interests in 50 limited partnerships (collectively, the "LPs") and eight limited liability companies (collectively, the "LLCs").  LeFever Mattson, CIP (as defined below), the Property Manager (as defined below), and the 56 LPs and LLCs that are listed on the List of Affiliated Debtors (filed with each voluntary petition) are referred to collectively herein as the "Debtors."[2]  An organizational chart for LeFever Mattson is attached hereto as **Exhibit 1**.

7.     The Debtors intend to file a Motion to employ me as Chief Restructuring Officer of all of the Debtors, effective as of the Petition Date.

8.     On the date hereof (the "Petition Date"), LeFever Mattson and 57 other Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.     To minimize the adverse effects of filing for bankruptcy protection on their business, the Debtors have filed several motions requesting various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value,

---

[2] One of the LLCs, Debtor Windscape Apartments, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 6, 2024.  Two LPs have not yet filed chapter 11 petitions.

(b) constitutes a critical element in achieving a successful resolution to these Chapter 11 Cases, and (c) best serves the Debtors' estates and creditors' interests.

10.     I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the First Day Motions.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge; information supplied to me by other members of the Debtors' management, employees, and professionals; information learned from my review of relevant documents; or my opinion given my experience and my knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Debtors to submit this declaration.

11.     Part I of this declaration describes the Debtors' business, their secured and unsecured debt, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

## I.     THE DEBTORS' BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11

### A.     Overview of the Debtors' Corporate Structure, History, and Business

12.     In 1990, Mr. LeFever purchased 50% of a real estate investment business owned by Mr. Mattson, creating LeFever Mattson.  The company's business was the ownership of investment real estate—single family homes as well as multi-unit properties.  Properties were owned by LeFever Mattson alone or as a tenant in common with other investors.  Eventually the business model shifted to creating limited liability companies, and then limited partnerships, to purchase multi-family or other commercial properties.  This structure allowed LeFever Mattson to pool more capital by selling limited interests to a small number of accredited investors while typically reserving an ownership interest in the investment entity for itself as general partner or managing member.

13.     LeFever Mattson also has ownership interests in four California corporations: Debtor Home Tax Service of America, Inc., dba LeFever Mattson Property Management (the "Property Manager"), which provides property management services, including to those properties

owned by the LPs and the LLCs; Debtor California Investment Properties ("CIP"), a California corporation, which is a real estate brokerage; and non-debtors Pineapple Bear, a California corporation (which offers hospitality and catering services) and Harrow Cellars, a California corporation (which operates a winery and related businesses).

14.     LeFever Mattson has grown substantially since 1990 and today manages a portfolio of more than 200 properties (the "Properties"), comprised of commercial, residential, office, and mixed-use real estate, as well as vacant land, located throughout Northern California, primarily in Sonoma, Sacramento, and Solano Counties.  The Debtors generate income from the Properties through rents (the "Rents") and use the proceeds to fund their operations.

15.     LeFever Mattson has no employees.  The Property Manager has 45 employees.   It provides property management services for the Properties through a set of management agreements, and it holds bank accounts in trust for the LLCs and LPs, for rents and expenses.  CIP is a real estate brokerage that has provided services in connection with the Properties and others purchased or sold by LeFever Mattson, the LPs, and the LLCs.  CIP, the LPs, and LLCs have no employees.

**B.     The Mattson Transactions**

16.     Since my engagement on July 18, 2024, I have worked closely with LeFever Mattson and the other Debtors in their efforts to maximize enterprise value in the wake of what, in retrospect and on information and belief, was a decade or more of financial misconduct by Mr. Mattson.

17.     Mr. Mattson appears to have used LeFever Mattson and many of the LPs and LLCs to facilitate a years-long campaign of self-serving transactions, many of which were not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs (collectively, the "Mattson Transactions").  Investigation into the Mattson Transactions is ongoing.  However, on information and belief, the transactions took two primary forms.

18.     *First*, Mr. Mattson purported to sell equity interests in over 25 of the LPs and LLCs to hundreds of investors through transactions that, on information and belief, were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson or the appropriate LP

or LLC (collectively, the "Mattson Interest Sales").  The proceeds of the Mattson Interest Sales—which, based on initial investigation, appear to have amounted to over $45 million during the period of May 2017 through March 2024—appear to have gone ultimately to Mr. Mattson, rather than to LeFever Mattson or the appropriate LP or LLC.  LeFever Mattson, the Property Manager, and 12 of the LPs and LLCs are now defendants in lawsuits, including a putative class action, by investors claiming to have purchased legitimate LP or LLC interests through transactions with Mr. Mattson—though, on information and belief, those alleged transactions and interests were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs.  The Debtors do not know how many additional LPs and LLCs may have been affected by Mattson Interest Sales.

19.    ***Second***, on information and belief, Mr. Mattson caused certain of the LPs and LLCs to purchase properties owned by Mr. Mattson's own investment company—by executing the transactions himself on behalf of both buyer and seller (collectively, the "Mattson Property Sales").  Some of the Mattson Property Sales were at inflated prices, and some conveyed properties encumbered by high-interest loans with balloon payments, which Mr. Mattson took out through his own investment company and on Ih he has now defaulted.  The Mattson Property Sales have clouded title on a significant portion of the LeFever Mattson real estate portfolio, and a number of LPs and LLCs now hold properties, obtained through Mattson Property Sales, that are encumbered by loans that are in default.

20.    The Debtors believe that these Chapter 11 Cases are necessary to fairly and transparently resolve the uncertainty that the Mattson Transactions have created for the Debtors and their stakeholders.

C.    **The Debtors' Secured and Unsecured Debt**

21.    As shown in the Debtors' consolidated *List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (the "Top-30 List"), the Debtors have unsecured debt in the form of trade debt, unsecured notes payable, prepaid rent or security deposits held for tenants of the Properties, and litigation claims.  The Debtors also owe some unsecured debt to insiders,

including other Debtors, that they have incurred in the ordinary course of business to meet expenses.

22. Approximately 29 secured lenders (the "Lenders") appear to hold deeds of trust and assignments of rents on the Properties. As discussed further below, the Lenders include both institutional and individual lenders that have made loans to the Debtors on a variety of terms.

23. The Debtors have not completed a thorough review and analysis of the entirety of the Lenders' loan documents. As mentioned above, the original borrower on many of the loans was an entity controlled by Mr. Mattson, such that final loan documents may not be in the Debtors' possession.

**D.     Events Leading Up to Chapter 11 Filing**

24. LeFever Mattson, the Property Manager, and 12 of the LPs and LLCs are defendants in lawsuits, including a putative class action, by investors alleging that they were parties to Mattson Interest Sales. A primary purpose of these Chapter 11 Cases is to consolidate those claims—and any similar claims against the Debtors yet to be filed—for fair and transparent resolution.

25. A second purpose of these Chapter 11 Cases is to address the Mattson Property Sales, many of which involved loans from a particular lender, Socotra Capital ("Socotra").

26. On information and belief, from approximately 2019 through 2023, Mr. Mattson caused KS Mattson Partners L.P. (the "Mattson Partnership"), a partnership that he beneficially owns, to purchase numerous properties (the "Mattson Properties") that were financed by loans issued by Socotra (the "Socotra Loans"), and then caused the Mattson Partnership to sell the Mattson Properties, sometimes at inflated prices, to the LPs and LLCs—still encumbered by the Socotra Loans.

27. On information and belief, the Mattson Partnership has not made required payments on the Socotra Loans, such that the Mattson Properties, now all held by the LPs and LLCs, are subject to foreclosure proceedings by Socotra.

28.     The Debtors have thus far successfully negotiated forbearances with Socotra prior to the foreclosure sale of any of the Mattson Properties.  However, absent a stay, the Debtors believe that foreclosure sales of Mattson Properties are likely.

29.     The Debtors believe that there may be meaningful equity value in the Mattson Properties and intend to engage one or more brokers to market and sell the properties.

30.     Accordingly, the Debtors have filed these Chapter 11 Cases to facilitate the fair and transparent resolution of claims arising from Mattson Interest Sales, to stay foreclosure sales of Mattson Properties, and to otherwise preserve and maximize value for the benefit of the Debtor's stakeholders.

31.     As of the Petition Date, Mr. LeFever and Mr. Mattson have resigned from any director or officer positions with any of the Debtors, and the Board of Directors of LeFever Mattson is comprised of two independent directors: Rishi Jain and Lance Miller.

## II.     FIRST DAY MOTIONS[3]

### A.     Joint Administration Motion

32.     The Debtors, including Windscape Apartments, LLC,[4] are affiliates of each other, and LeFever Mattson is the parent entity of the other Debtors.  Through this First Day Motion, the Debtors seek entry of an order directing the joint administration of the Chapter 11 Cases for procedural purposes only.  The Debtors respectfully request that the Court maintain one file and one docket for the Chapter 11 Cases under the case of LeFever Mattson, and that the Chapter 11 Cases be administered under the consolidated caption set forth in the Motion.

### B.     Motion Regarding Consolidated Creditor List

33.     Through this First Day Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (b) file a consolidated list of the Debtors' thirty (30) largest unsecured

---

[3]     Capitalized terms used in Part II of this Declaration but not otherwise defined shall have the meanings given to them in the First Day Motion to which the paragraphs relate.

[4]     Windscape Apartments, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 6, 2024

creditors in lieu of filing a separate top twenty creditor list for each Debtor; (ii) implementing certain procedures for the mailing of the Notice of Commencement; and (iii) granting related relief.

34.     The Property Manager handles operations for nearly all of the Debtors.  It uses a single software program, Yardi Systems, to manage all of the Properties owned by the Debtors. The Debtors use many of the same vendors and suppliers for the Properties.  While the Debtors are able to separate their creditors by entity, due to the consolidated nature of the Debtors' operations, a significant number of their creditors overlap among the various LLCs and LPs.  It would be unduly burdensome to create a separate mailing matrix for each of the nearly 60 debtors.

## C.     Application to Retain Claims Agent

35.     Through this First Day Motion, the Debtors seek entry of an order engaging and appointing Verita as the Debtors' claims and noticing agent in the Chapter 11 Cases, effective as of the Petition Date.  Among other things, Verita will be responsible for the distribution of notices, the maintenance of a case website, and the administration, maintenance, processing, and docketing of proofs of claim in the Chapter 11 Cases.  The terms of Verita's retention are set forth in the Standard Claims Administration and Noticing Agreement (the "Engagement Agreement"), which is attached as Exhibit 1 to the Proposed Order on the Motion.  For the avoidance of doubt, Verita is seeking approval of its engagement based solely on the terms and provisions as set forth in this Application and the Proposed Order attached hereto.

36.     By a separate application, the Debtors will seek authorization to retain and employ Verita as administrative advisor in these Chapter 11 Cases pursuant to section 327(a) of the Bankruptcy Code, because the administration of these Chapter 11 Cases will require Verita to perform duties outside the scope of 28 U.S.C. § 156(c).

37.     The Debtors include nearly 60 entities, each of which is associated with a diverse set of creditors.  The individual mailing matrices would include investors in, trade creditors of, and tenants of all of these entities.  The complexity of these matrices further arises from the interconnections between the Debtors and their creditors, resulting in overlapping claims.  These records require extensive work and time from staff to analyze and prepare into individual matrices.

It would be unduly burdensome to require the Debtors' limited staff to prepare mailing matrices and notices to all parties for each of the Debtors.

**D.   Motion to Extend Time to File Schedules and Statements**

38.   Through this First Day Motion, the Debtors request entry of an order extending the Schedules and Statements Deadline by 32 days, to October 28, 2024, granting the Debtors a total of 46 days after the Petition Date to file their Schedules and Statements, without prejudice to the Debtors' right to request additional time if necessary.  The requested extension will allow the Debtors time to prepare the Statements and Schedules properly given their limited number of employees.[5]

39.   The Debtors have computerized records of the information required for the Schedules and Statements in the Chapter 11 Cases.  However, these records require work and time from experienced staff to analyze and consolidate into the Schedules and Statements required by Section 521 of the Bankruptcy Code.  These same employees manage the day-to-day business of operating over 200 Properties with nearly 1,000 individual rental units.  The individual Debtors do not have their own teams available to assist them with the reporting requirements of the Bankruptcy Code.

**E.   Cash Management Motion**

40.   Through this First Day Motion, the Debtors request authorization to continue using their Cash Management System, Bank Accounts, and Business Forms.  This will benefit the Debtors' estates by maintaining consistency in their receipt of Rents and prevent disruption for their tenants and creditors, aiding the consistency of the Debtors' cash flow as they begin these Chapter 11 Cases.  A diagram of the Cash Management System is attached hereto as **Exhibit 2**.

41.   The Debtors have approximately 54 accounts, the Bank Accounts,[6] approximately 43 of which are maintained with Citizens Business Bank N.A. ("CB Bank").  The remaining

---

[5]   Windscape Apartments, LLC, which is a Debtor included in the relief sought herein, previously received an extension to September 19, 2024.  The Debtors are requesting that it be extended further to October 28 so that all Schedules and Statements may be prepared together in an efficient uniform process.

[6]   The Bank Accounts include the account (the "Windscape Account") held by the Property Manager on behalf of Windscape Apartments, LLC ("Windscape"), debtor in case number 24-

accounts are with Exchange Bank, Umpqua Bank, Wells Fargo Bank, N.A., BMO Bank, N.A. dba Bank of the West, California Bank of Commerce, N.A., and First Bank (collectively, the "Banks"). Attached hereto as **Exhibit 3** is a schedule of the Debtors' Bank Accounts in existence as of the Petition Date, including the titles and last four digits of the numbers of each (the "Bank Account Schedule").

42. CB Bank, Exchange Bank, Umpqua Bank, Wells Fargo Bank and BMO Bank are all FDIC-insured institutions and U.S. Trustee Authorized Depositories for debtors in possession in the Northern District of California. The Debtors have two Bank Accounts, one at California Bank of Commerce and one at First Bank, that are not authorized depositories (collectively, the "Unauthorized Depository Accounts"). The Debtors are in the process of closing the Unauthorized Depository Accounts and transferring the funds to newly opened CB Bank accounts, which they expect will be accomplished within 30 days of the Petition Date.

43. The Property Manager holds a bank account in trust for its non-debtor, non-LeFever Mattson related management clients. Those accounts are not debtor in possession accounts and, as such, are not included on the Bank Account Schedule.

44. Each of the LLCs and LPs with operating income has a trust account held by the Property Manager, a Debtor in these Chapter 11 Cases, for that LLC's or LP's benefit. The Rents are deposited into the Bank Account for the LLC or LP owner of that particular Property. This is done through one of four methods: (1) automated clearing house ("ACH") deposits; (2) credit or debit card payments; (3) checks; or (4) third-party payment systems.[7] Over half of the Debtors' apartment residents make automatic monthly payments through ACH or by credit or debit card.

---

10417 (CN). That account, ending in 3175, was the subject of Windscape's *Motion of Debtor for Order Approving Continued Use of Cash Management System, Bank Account, and Business Forms* [Windscape Dkt. No. 23] (the "Windscape Cash Management Motion") which was granted on an interim basis. This First Day Motion includes the Windscape Account and is intended to encompass and supersede the Windscape Cash Management Motion.

[7] These include the walk-in payment system, WIPS, which allows residents to pay rent with cash and Flexible Finance Inc. which is a rent-financing system that allows residents to pay in two installments over the course of a month instead of the traditional monthly payment.

Those payments are (and must be) set up through the Property Manager's online tenant portal and are thereby automatically allocated to the appropriate Property and unit.

45.     Disbursements are made from the Bank Accounts after being reviewed and approved by the Property Manager. Essentially, each of the Bank Accounts acts as an operating account for the beneficiary LLC or LP.

46.     Closing the Bank Accounts would break the automated connection between those Banks and the tenants' bank accounts, the credit and debit card companies, or third-party payment systems. Tenants would then have to manually pay their rent by mailing checks to the Property Manager, which would take longer to receive and add to the risk of payments being denied for insufficient funds. Those without printed checks would need to go to the expense and hassle of purchasing money orders or cashier's checks. Eventually, residents would be able to reconnect to the automated system, but they would have to reinitiate the process themselves. All of the foregoing would slow the Property Manager's receipt of the Rents, thus disturbing and delaying the Debtors' cash flow.

47.     Closing the Bank Accounts would also be a significant administrative burden for the Debtors. With over 50 accounts collecting income from over 946 individual units, closing the existing Bank Accounts and opening new ones would take a potentially overwhelming amount of staff time, in addition to the time necessary to reestablish the automated receipts and payments. At a time when the Debtors' employees are already taxed with the chapter 11 reporting requirements, recreating the Debtors' entire Cash Management System would unnecessarily hamper the Debtors' ability to smoothly transition into Chapter 11.

48.     From time to time, and in the ordinary course of business, the Debtors incur certain obligations for the maintenance of the Cash Management System. These obligations primarily consist of amounts owed to the Banks for the maintenance of and services related to the Bank Accounts (the "Cash Management Fees"). The Cash Management Fees for the Bank Accounts are withdrawn from the Bank Accounts periodically throughout the month depending on the service needed. The total of the Cash Management Fees averages approximately $2,000 per month. The Debtors estimate that, other than the September prepetition Cash Management Fees, there are no

other accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees. Accordingly, the Debtors seek authorization to pay any Cash Management Fees up to an aggregate amount of $5,000 on an interim basis.

49.     In the ordinary course of business, the Debtors issue checks and use a variety of business forms, including, but not limited to, leases and invoices (collectively, the "Business Forms"). To prevent disruption to residents, tenants, suppliers, and other vendors from new forms or otherwise complying with Bankruptcy Local Rule 2015-1(a), pursuant to this Motion, the Debtors seek authority to continue using its Business Forms substantially in the form used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtors in Possession." The Debtors do not believe that any prejudice will be suffered by any party if this relief is granted.

**F.     Employee Wages and Benefits Motion**

50.     Through this First Day Motion, the Debtors seek authority to continue to honor their Prepetition Employee Obligations up to the Section 507 Cap so as to minimize the disruption to their employees. The Debtors further request that the Court authorize the Banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the disbursement accounts to the extent that such checks or electronic fund transfers relate to any Prepetition Employee Obligations.

51.     As of the Petition Date, the Debtors have 45 employees, all of whom are employed by the Property Manager. The Debtors could not operate without these employees. They are critical to maximizing the value of the Debtors' estates for the benefit of their creditors. The employees' skills, knowledge, and understanding of the Debtors' infrastructure, operations, and real property assets are essential to the value of the Debtors' business. They also maintain the Properties in good and habitable condition under the terms of their various leases. These employees manage the Debtors' rental properties and have relationships with the Debtors' tenants that are critical to, among other things, effective communication with tenants as the Debtors transition into the Chapter 11 Cases. Furthermore, the employees have the knowledge of the

Properties needed to sell them at the highest possible price. Without them, the Debtors would have difficulty realizing, let alone maximizing, the value of their substantial real estate portfolio.

52.    The Debtors' employees receive their paychecks twice a month, in arrears. They receive checks on the third day of a month for work done from the 15th through the 28th of the prior month, and they receive checks on the 18th day of a month for work done from the 29th day of the prior month through the 14th day of the month (the "Wages"). Anticipating the filing of the bankruptcy petitions, the Debtors prepaid their employees on September 11, 2024, for work performed through and including September 13, 2024. The next regularly scheduled payroll is on October 3, 2024, for entirely postpetition work performed from September 14 through September 27. As a result, the Debtors believe that all prepetition wages have been paid. However, in an abundance of caution, the Debtors seek authority to pay any unpaid prepetition wages not to exceed $15,150 to any applicable employee (the maximum priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, hereafter the "Section 507 Cap").

53.    The Debtors offer vacation benefits (the "Vacation Benefits") to their full-time employees. Employees accrue vacation time each pay period. As of the Petition Date, the Debtors do not believe that any employees are owed compensation for Vacation Benefits; however, to the extent they are, the Debtors seek authority to pay the Vacation Benefits up to the amount of the Section 507 Cap, per employee. The Debtors further seek authority to honor accrued vacation pay in the ordinary course of business.

54.    The Debtors take deductions from their employees' paychecks to make payments on behalf of the employees for or with respect to, among other things, the Debtors' Prepetition Benefits, amounts due to federal, state and local taxing authorities for the Employee Taxes, and garnishments under court order. As of the Petition Date, the Debtors' payroll processor, I Human Capital Management ("I"), may be holding amounts deducted from their employees' Prepetition Compensation that have not yet been remitted to the taxing authorities, benefits providers, or courts (collectively, the "Prepetition Obligations"). Such withheld funds, to the extent that they remain in the Debtors' or OnePoint's possession, constitute moneys held in trust and, therefore, are not property of the Debtors' estates. Thus, directing such funds to the appropriate parties should not

require Court approval. Nevertheless, the Debtors seek authority to direct that any Prepetition Obligations withheld from the employees' paychecks and owed to third party taxing authorities, benefits providers, or courts, including those incurred prior to the Petition Date, be delivered as required.

55. In the ordinary course of business, the Debtors maintain certain benefits for their employees, including the following: (a) health-related benefits, such as medical, dental, vision; and insurance benefits such as life insurance and accidental death and dismemberment insurance (collectively, the "Health Benefits") and (b) provide access to a 401(k) plan (the "Voluntary Benefits," and jointly with the Health Benefits, the "Employee Compensation and Benefit Programs").

56. The Debtors provide their employees with various health-related benefits. They offer medical insurance through Kaiser Foundation Health Plan ("Kaiser"). Employees may choose from one of three plans with varying deductible amounts. Employees receive credit for reimbursements in the amount set by their chosen plan at the start of the calendar year unless they have chosen the full reimbursement plan in which case their reimbursements are not capped. The Debtors pay for the Kaiser premium and, depending on the plan chosen by the employee, part or all of the deductible. The employees use health care debit cards to pay for treatment so that funds are drawn directly from the Debtors' bank accounts. However, if the employee does not use the debit card for a service and instead pays out of pocket, they must submit a request for reimbursement from the Debtors. The Debtors seek authority to honor any prepetition reimbursement requests for services incurred but not paid prior to the Petition Date.

57. The Debtors offer dental and vision coverage through Humana Inc. ("Humana") and life and accidental death and dismemberment insurance through The Guardian Life Insurance Company of America ("Guardian"). Approximately $18,762 is owed to Kaiser, approximately $3,017 is owed to Humana, and approximately $830 is owed to Guardian for the September premium payments. Those payments were sent by check to the respective insurers but may not have cleared the Debtors' accounts prior to the Petition Date. In the event that those premiums

have not been paid, the Debtors seek authority to pay the foregoing, all to the extent that they fall within the Section 507 Cap.

58. The Debtors believe that they are current on their other obligations under the Health Benefits. However, out of an abundance of caution, the Debtors seek authority, without being required, to pay all prepetition amounts under the Health Benefits that are discovered to be outstanding, including any that were incurred but not reported prepetition, in order to ensure that there is no disruption to employees' health-related coverage, subject only to the Section 507 Cap.

59. The Debtors offer employees access to a 401(k) plan (the "401(k) Plan") where the participants' portions are funded through deductions from their paychecks. The Debtors match the participants' contributions up to 4% of that participant's salary. Empower Annuity Insurance Company of America administers the 401(k) Plan.

60. The Debtors believe that they are current on all of their other obligations under the 401(k) Plan. However, out of an abundance of caution, the Debtors seek authority, without being required, to pay all prepetition amounts under the 401(k) Plan that may be outstanding, including any that were incurred but not paid prepetition, subject only to the Section 507 Cap.

61. The Debtors, as employers, are required by law to withhold federal, state, and local taxes (the "Employee Taxes") from wages for remittance to appropriate taxing authorities. These withheld funds, to the extent that they are in the Debtors' possession, constitute monies held in trust and are not property of the Debtors' bankruptcy estates. In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Tax Obligations"), and remit the same to the appropriate state and federal taxing authorities. The Debtors should be authorized to pay all Payroll Tax Obligations as they come due, including any obligations arising from payment of the Prepetition Compensation pursuant to the Interim and Final Orders on this Motion.

/ / /

/ / /

62.     The Debtors' employees pay for certain expenses for which the Debtors reimburse them.  The Debtors customarily reimburse their employees for a variety of business expenses incurred in the ordinary course of their business, including milage and cell phone service (the "Reimbursable Expenses").   To obtain reimbursement of business expenses, an employee is required to submit a request, accompanied by itemized receipts or milage report for approval by the employee's supervisors and/or management.  Once approved, reimbursements are paid directly to the employee's bank account.   In a typical month, the Debtors reimburse employees for approximately $7,100 of expenses in the aggregate.

63.     It is likely that certain employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expenses that are outstanding because, among other things, employees may not have submitted reimbursement forms for all accrued expenses.  The Debtors request that they be authorized to reimburse all such expenses when the reports are submitted, in order to assure such employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

64.     The Debtors do not expect that their obligations for Reimbursable Expenses as of the Petition Date will exceed $10,000 in the aggregate.

**G.     Utilities Motion**

65.     Through this First Day Motion, the Debtors propose that, upon the request of any Utility Company pursuant to the procedures set forth in the Motion, the Debtors provide an adequate assurance deposit in the amount of the average of two weeks' worth of fees over the year prior to the request by the Utility Company (the "Proposed Adequate Assurance"), and that requests and deposits be accounted for each account used by the Debtors.  The Debtors propose to adopt and follow defined procedures (the "Adequate Assurance Procedures") to address the right of any Utility Company under section 366I(3) of the Bankruptcy Code to request the Proposed Adequate Assurance or to modify the proposed amount of adequate assurance.

66.     The Debtors rely on utility services, including, but not limited to, telephone, internet, gas and electric, and waste removal services (collectively, the "Utility Services") provided

by the Utility Companies, including those identified on Exhibit C to the Motion, to operate their businesses. As discussed above, the Debtors own and operate a variety of investment properties, including residential, multifamily, mixed-use, office, commercial, industrial, and agricultural, and rely critically on the Utility Services for their operations. Many of the underlying accounts involve very small monthly charges which have been paid consistently on a timely basis. Moreover, given the nature of the Debtors' business, providing uninterrupted service from the Utility Companies is essential to maintaining value and administering these Chapter 11 Cases. The Debtors are prepared to provide additional deposits as necessary to maintain the continuity of the Utility Services. In the meantime, any temporary or permanent discontinuation of Utility Services could irreparably disrupt the orderly administration of these cases, damage the Debtors' assets, and, as a result, diminish recoveries to the Debtors' stakeholders.

**H.    Motion to Authorize Payment of Certain Prepetition Taxes**

67.    Through this First Day Motion, the Debtors seek authority to pay, in their discretion, the Taxes and Assessments, in order to, among other things, prevent the Taxing Authorities from taking actions that may interfere with the administration of the Chapter 11 Cases and impede the Debtors' ability to successfully sell Properties, including, in some instances, asserting liens on the Debtors' property and imposing penalties and/or significant interest on past-due taxes.

68.    Ample authority and cause exist to authorize the payment of the Taxes and Assessments, including, without limitation, that: (i) certain of the Taxes and Assessments may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code or result in the imposition of liens on the Debtors' property if unpaid, and (ii) interest and penalties may accrue on certain unpaid Taxes and Assessments, even after the Petition Date. Further, the Court has authority to grant the relief requested in the Motion pursuant to section 363(b) and 105(a) of the Bankruptcy Code.

69.    In the ordinary course of operating their businesses, the Debtors incur a variety of Taxes and Assessments that they remit periodically to various federal, state, and local taxing, licensing, and other governmental authorities. As set forth in further detail below, the Debtors

generally pay the Taxes and Assessments semi-annually or annually, as required by applicable laws. As of the Petition Date, the Debtors estimate that an aggregate amount of approximately $219,059 in Taxes and Assessments are due and owing to the various taxing authorities (the "Taxing Authorities"), the entire amount of which relates to the prepetition period.

70.     The Debtors operate numerous investment properties throughout Northern California and pay annual taxes to various Taxing Authorities on account of the Debtors' real property (collectively, the "Real Property Taxes"). As of the Petition Date, the Debtors owe approximately $173,581 in Real Property Taxes, which were due as of September 30, 2024, and which will be delinquent if not paid by that date, and therefore are all due and payable within the interim period. The Debtors therefore to be authorized, but not directed, to pay, on both an interim and final basis, an amount not to exceed $219,059 in prepetition Real Property Taxes. The Debtors will also pay postpetition Real Property Taxes as they come due, subject to any agreement or order with respect to cash collateral.

**I.      Motion to Authorize Use of Cash Collateral**

71.     Through this First Day Motion, the Debtors seek authority for emergency use of the Cash Collateral of Accepting Lenders for Property Level Expenses as set forth in the Property Budget; and reserve the right to supplement the Motion to use the Cash Collateral of any Nonaccepting Lender upon an evidentiary presentation demonstrating that such Nonaccepting Lender is adequately protected.

72.     For Accepting Lenders, the Debtors further seek authority to provide adequate protection to such Accepting Lenders by (A) making monthly debt service payments in accordance with pre-filing practices, (B) paying Property Level Expenses in order to maintain the value of the Property or Properties subject to such Accepting Lender's mortgage(s), and (C) providing continuing reporting consistent with pre-filing practices. Accepting Lenders will not receive additional or replacement liens, and cash generated by the underlying Property will be maintained in a concentration account, by Debtor, in accordance with past and continuing practices of the Property Manager.

73. For Lenders that wish to opt out, *i.e.*, Nonaccepting Lenders, the Debtors do not seek authority to use their Cash Collateral on an interim basis, unless and except to the extent that such Nonaccepting Lender consents to such use.

74. The Debtors have identified twenty-nine (29) lenders (the "Lenders") that hold mortgages on the vast majority of the more than two hundred (200) Properties owned by the Debtors. Most of the Properties are generating rents or other cash proceeds (hereafter, "Cash Collateral") that are subject to the Lenders' mortgages. The Debtors' preliminary analysis suggests that (1) the amount of each mortgage is, on average, less than 60% of the corresponding Property's value; and (2) the average aggregate net cash flow from the Properties is well in excess of $100,000 per week before debt service and more than $50,000 per week after debt service. The Debtors have historically had no difficulty making debt service payments on their Properties and, but for the Mattson Transactions, the Debtors would not have had cash flow issues or the need to commence these Chapter 11 Cases.

75. The Debtors have been unable to negotiate the use of Cash Collateral with the Lenders. Based on their discussions with certain of the Lenders and their understanding of the interests of other Lenders, they believe that several will be Accepting Lenders (as hereafter defined) that will free sufficient Cash Collateral for the Debtors to manage their affairs until the final hearing on this Motion. With respect to Cash Collateral generated by a Property owned by a Nonaccepting Lender (as hereafter defined), the Debtors reserve the right to use their Cash Collateral without consent by presenting evidence that the interest of such Nonaccepting Lender is or will be adequately protected, *e.g.*, by an equity cushion, monthly payments, or other forms of protection contemplated by section 361 of the Bankruptcy Code.

76. The Debtors require the use of Cash Collateral to operate their businesses as set forth in the collection of 13-week budgets (each, a "Property Budget") attached hereto as **Exhibit 4**, reflecting cash flows for each Property, along with an index to assist Lenders in identifying the Properties in which each maintains an interest. Each Property Budget is comprised of expenses directly related to the operation of the Properties and subject to certain mortgages, such as maintenance, property insurance, debt service, utilities, and property management.

77. LeFever Mattson, as a managing member and/or limited partner of many of the Debtors, has a continuing equity interest in those Debtors. Subject to further developments in these Chapter 11 Cases, it is anticipated that LeFever Mattson will pay the majority of the restructuring costs relating to these Chapter 11 Cases out of its interest in the various Properties owned by the other Debtors. To the extent that other Debtors accumulate cash after paying expenses permitted hereby, that cash will remain on the books of such Debtor and not be used for the benefit of LeFever Mattson or the other Debtors absent a noticed motion and further Court order authorizing the use of such accumulated cash.

**J.    Motion to Maintain Insurance Programs**

78. Through this First Day Motion the Debtors seek authority to (i) maintain the Insurance Programs; (ii) pay the Insurance Obligations; and (iii) modify the automatic stay imposed by section 362 of the Bankruptcy Code to permit employees to proceed with their claims under Debtors' programs established in compliance with the Workers Compensation Program.

79. In connection with the operation of their businesses, the Debtors maintain numerous property and liability insurance programs that provide the Debtors with insurance coverage for claims relating to, among other things, workers' compensation, property liability, and employee health (collectively, the "Insurance Programs") through different insurance carriers (the "Insurance Carriers"). The Debtors maintain numerous Insurance Programs to cover their Properties in the ordinary course of their business.

80. The Debtors are required to pay, either directly or through the Debtors' insurance brokers, premiums and other sums for coverage under the Insurance Programs (collectively, the "Insurance Obligations"). The Insurance Obligations are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for most of the Insurance Programs are determined annually and are paid at the inception of each policy, on a monthly basis, or pursuant to the terms of the applicable insurance premium financing agreement.

81. One of the Insurance Programs is the Debtors' policy of directors' and officers' liability insurance ("D&O Insurance"), which was purchased prior to the Petition Date and for

which payments will be due post-petition, pursuant to a financing agreement with the Insurance Carrier.

82.     The Debtors owe approximately $60,000 in Insurance Obligations due as of the Petition Date or coming due in the period thirty days after the Petition Date, but are unaware of any other outstanding amounts owed with respect to any Insurance Program (the "Interim Insurance Obligations").  However, it is possible that Debtors may identify outstanding Interim Insurance Obligations as of the Petition Date.

83.     More critically, certain of the Insurance Programs will expire imminently (the "Expiring Programs").  The renewal and continuation of the Expiring Programs is critical to a successful administration of these Chapter 11 Cases and required of chapter 11 debtors, as discussed below.  Failure to maintain the Insurance Programs would pose a risk to the estates or to the public.  Therefore, the Debtors request authority to renew the Expiring Programs and pay the premiums associated with the Expiring Programs when they become owing and due.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 12, 2024.

*/s/ Bradley D. Sharp*
Bradley D. Sharp