**REED SMITH LLP**
Marsha A. Houston (Cal. Bar No. 129956)
Shayna A. Jackson (Cal. Bar No. 340864)
1901 Avenue of Stars, Suite 700
Los Angeles, CA 90067-6078
Telephone: (310) 734-5200
Facsimile: (310) 734-5299

Michael P. Cooley (TXBN 24034388)*
mpcooley@reedsmith.com
REED SMITH LLP
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
Telephone: 469.680.4200
Facsimile: 469.680.4299
* *motion for admission pro hac vice pending*

*Attorneys for Fannie Mae*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re<br><br>LEFEVER MATTSON, a California corporation, et al.[1],<br><br>Debtors in Possession. | Case No. 24-10545<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**FEDERAL NATIONAL MORTGAGE ASSOCIATION'S LIMITED OBJECTION TO DEBTORS' MOTION TO ESTABLISH PROCEDURES FOR REAL PROPERTY SALES** |

---

[1] The last four digits of LeFever Mattson's tax identification number are 7537. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://veritaglobal.net/LM. The address for service on the Debtors is 6359 Auburn Blvd., Suite B, Citrus Heights, CA 95621.

Federal National Mortgage Association ("*Fannie Mae*"), by and through its undersigned counsel, hereby files this limited objection (the "*Objection*") to the *Motion of Debtors to Establish Procedures for Real Property Sales* (the "*Motion*"). [Dkt. No. 689.] In support of this Objection, Fannie Mae respectfully states as follows:

## PRELIMINARY STATEMENT

1. Debtor Foxtail Pine, LP ("*Foxtail*") owns and operates that certain multifamily property known as Sharis Apartments, located at 453 A Fleming Street E in Vallejo, California (the "*Collateral*"), and described with more particularity in the Deed of Trust (as defined below). The Collateral is encumbered by a Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "*Deed of Trust*") to secure repayment of a Multifamily Note (a "*Note*") dated August 7, 2019, by Foxtail in favor of Greystone Servicing Company LLC. The terms of the loan made under the Note and secured by the Deed of Trust are set forth more fully in that certain Loan Agreement, dated August 9, 2019, between Foxtail and Greystone and certain other loan and security documents executed in connection therewith (such documents, together with the Note, Deed of Trust, and Loan Agreement, collectively, the "*Loan Documents*").

2. Prior to the Petition Date, the Note, Deed of Trust, and other Loan Documents were assigned to Fannie Mae. As of the Petition Date, the unpaid principal balance of the Note owed to Fannie Mae was approximately $3.58 million, plus accrued and unpaid interest and fees payable under the Note. The *Schedules of Assets and Liabilities* filed by the Debtors in these Chapter 11 cases assert that the value of the Collateral is $7.5 million. Accordingly, Fannie Mae is operating under the assumption that any proposed sale of the Collateral would be governed by the Large Asset Sale Procedures.

3. The Debtors claim their proposed Sale Procedures provide certain protections to interested parties when, in fact, the opposite is true; their "one size fits all" approach to selling the assets at issue cuts off more guardrails than it provides.

4. As a general matter, the Debtors' proposal to shoehorn the potential sales of over 170 individual properties into one of two condensed procedures for "Large Assets" and "Small Assets" is too streamlined an approach to appropriately maximize the value of a real estate portfolio as large

and varied as this one. While Fannie Mae does not *per se* oppose an effort to efficiently and effectively market and sell the Collateral and other Properties, the Debtors have failed to establish how the proposed Sale Procedures discussed herein will have that effect. In fact, as written, the proposed Sale Procedures threaten to drive litigation costs *up* rather than down and to unilaterally—and impermissibly—impair Fannie Mae's contractual lien rights. For the reasons set forth herein, Fannie Mae objects to the proposed Sale Procedures, objects to the sale of its Collateral absent strict compliance with the requirements of 11 U.S.C. § 363(f) and reserves the right to join in any other objection to the Sale Motion.

**LIMITED OBJECTION**

### I. The Procedures for Bidding Do Not Protect the Rights of Secured Creditors

5. As written, the Sale Procedures do not safeguard Fannie Mae's right to credit bid the full amount of its allowed claim under § 363(k) nor its right to protect secured creditors' interests in the Properties to be sold. Under both the Large Asset and Small Assets Sale Procedures, a secured creditor wishing to exercise its credit bid right under § 363(k) must (i) pay any Closing Costs or (in a Large Asset Sale) Break-Up Fee associated with such sale, including any Broker's commission; and (ii) declare its intent to credit bid on just seven calendar days' notice.[2]

6. There is no statutory basis, and Fannie Mae is aware of no case law, that permits a debtor to *condition* a secured creditor's right to credit bid in this fashion. Section 363(k) imposes no such requirement that a secured creditor pay a break-up fee to assert its right to credit bid and some courts even hold the opposite. *See In re Ray Realty Fulton, Inc.*, No. 09-41225 (DEM), 2009 Bankr. LEXIS 2415, at *4 (Bankr. E.D.N.Y. Aug. 21, 2009) (holding break-up fee and stalking horse expense reimbursement are not costs of a sale but rather "an administrative expense payable by the debtor's estate [as] an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of Sections 503(b) and 507(a)(2) of the Bankruptcy Code."); *see also In re Chrysler LLC,* No. 09-50002 (AJG), 2009 Bankr. LEXIS 2179, at *23-24 (Bankr. S.D.N.Y. May

---

[2] The proposed Large Asset Sale Procedure would permit the Debtors to set a Break-Up Fee up to "3% of the total cash consideration payable under [the] Stalking Horse Agreement," *without* consultation with individual secured creditors and without a procedure to substantively object. [*See* Mot. at 16:2-5.]

7, 2009). Indeed, the Collier treatise has similarly observed in the parallel context of a secured creditor's right to credit bid in a plan-based sale under § 1129(b)(2)(A)(ii) that the preservation of the credit bid right "gives the secured creditor protections against attempts to sell the collateral too cheaply; if the secured party thinks the collateral is worth more than the debtor is selling it for, it may effectively bid its debt and take title to the property." 7 Collier on Bankruptcy ¶ 1129.04 (16th 2024). While a debtor may certainly solicit a secured creditor's willingness to accept a discounted payoff in connection with a sale, outside the limited reach of § 506(c) (which is neither applicable here nor invoked by the Debtors), the Bankruptcy Code does not countenance the unilateral surcharge of a secured creditor's collateral.

7. This fundamental defect in the Sale Procedures is worsened by the fact that they do not set minimum bid amounts for any of the Properties, thus opening the door to solicit—and seek immediate approval of—bids to purchase assets for sale prices that do not cover the corresponding indebtedness. In such circumstance, Fannie Mae would be compelled—on just seven calendar days' notice—to indicate its intent to credit bid. Bankruptcy Rule 2002(a)(2) grants to creditors like Fannie Mae the right to 21 days' notice of "the proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time" as permitted under Bankruptcy Rule 9006(c). Nothing in the Motion purports to explain—much less justify—a broad shortening of the standard notice periods under such circumstances. Instead, the Sale Procedures appear designed to enable the Debtors to solicit bids confidentially and then present secured creditors like Fannie Mae with a *fait accompli* in the form of a Sale Notice to which Fannie Mae must respond within a weeks' time or potentially find itself facing a unilaterally imposed short sale. The Bankruptcy Code simply does not countenance such a result.

8. As a result, the procedures grant in the Debtors broad discretion to select a proposed buyer or Stalking Horse Bidder if the Debtors determine the sale price and terms are reasonable. Notably, this grant of discretion imposes no requirement on the Debtors to set minimum bid amounts at prices that exceed the value of all liens on the Properties to be sold.

9. Further, § 363(f)(3) bars the Debtors, absent lienholder consent, from selling any Property free and clear unless the purchase price exceeds the aggregate value of all liens thereon.

11 U.S.C. § 363(f)(3). By conditioning Fannie Mae's credit bid right on the cash payment of any associated Broker's commission, Closing Costs, or Break-Up Fee, the Sale Procedures effectively compel Fannie Mae to accept a discounted payoff that is *less* than the value of Fannie Mae's liens unless Fannie Mae is willing to fund the Debtors' own administrative expenses associated with such sale. A sale under such terms cannot satisfy the requirements of § 363(f). The Court should require the Debtors to amend the Sale Procedures to make explicit that no Property may be sold free and clear without lienholder consent unless the sale price conforms with § 363(f)(3).

## II. The Bid Protections Will Not Maximize Value

10. The proposed blanket grant of authority to the Debtors to designate a Stalking Horse and set the associated Bid Protections should also be rejected as improper and unsupportable. When evaluating the propriety of bid protections, courts typically consider the proposed bid protections under the business judgment rule. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Other courts have held that bid protections should receive careful scrutiny and rigorously examine the proposed protections to determine whether they are in the best interests of the debtor, its estate, and creditors. *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999) (rejecting business judgment rule and noting that "other courts have authorized a more searching review" of break-up fees and adopting this latter view); *In re America West Airlines, Inc.*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (holding that the proposed bidding protection was not in the best interests of the debtor's estate, creditors or equity holders because the assets had been "thoroughly marketed" and the bidding protection would not "induce further bidding or bidding generally").] Under this more rigorous scrutiny, approval of bidding protection is appropriate only if the proposed bidding protection is "actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 533.

11. Here, there has been no such showing by the Debtors—and certainly no such showing on an asset-by-asset and sale-by-sale basis. As the Debtors themselves point out, the Properties' characteristics greatly vary: they are "comprised of commercial, residential, office, and mixed-use real estate, as well as vacant land," and "located in cities scattered across (mostly) Northern California, including Cameron Park, Carmichael, Ceres, Citrus Heights, Concord, Elk

Grove, Fairfield, Fresno, Napa, Orangevale, Perris, Roseville, Sacramento, San Leandro, Sonoma, Suisun City, Truckee, Vacaville, and Vallejo." Given this significant variability, the Debtors simply cannot demonstrate that their summary procedures are tailored to capture the highest and best bid for each asset.

12. The summary nature of the proposed Sale Procedures makes it impossible to determine whether the protections would be in the best interest of any given Property or are necessary to attract additional bidders or promote more competitive bidding. Indeed, given the condensed bid timeline and requirement that overbids exceed the Bid Protection amount, it is more likely that they will chill bidding to the estates' detriment. For this reason, the Bid Protections should be denied.

## **RESERVATION OF RIGHTS AND JOINDER**

13. Fannie Mae expressly reserves the right to (i) supplement this Objection at any time prior to the hearing on the Motion and/or Sale Hearing; (ii) raise additional or further objections to the Motion at any hearing on the Motion or the Sale Hearing; (iii) credit bid on the Collateral up to the value of its lien; and (iv) seek stay relief, as necessary, to protects its interests in the Collateral.

14. Fannie Mae further reserves the right to join in, and adopt the arguments and authorities, of any other objection to the Motion.

## **CONCLUSION**

15. Fannie Mae does not consent to the sale of its collateral and does not consent to accept anything less than repayment in full of its allowed secured claim. Fannie Mae further objects to the use of any of its Collateral (or the proceeds thereof) to pay any administrative expense incurred by the Debtors as the result of or in connection with the sale of Fannie Mae's collateral.

16. Fannie Mae respectfully requests that the Court Deny the Debtors' Motion unless the Debtors modify the Motion to address the deficiencies outlined herein.

//

//

| | | |
|---|---|---|
| DATED: February 12, 2025 | | REED SMITH LLP |
| | By: | /s/ *Marsha A. Houston* |
| | | Marsha A. Houston (Cal. Bar No. 129956) |
| | | Michael P. Cooley (TXBN 24034388)* |
| | | Shayna A. Jackson (Cal. Bar No. 340864) |
| | | Attorneys for Fannie Mae |
| | | *\* motion for admission pro hac vice pending* |